USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#
DATE FILED: 5-6-2013

UNITED STATES DISTRICT COURT )
SOUTHERN DISTRICT OF NEW YORK )
                              )
                              )            12 Civ. 8937 (LAP)
                              )
RAFIQ SABIR, MOVANT           )
                              )            05 Cr. 673-2 (LAP)
                              )
                              )
          v.                  )
                              )
                              )
UNITED STATES OF AMERICA      )
                              )
                              )
                              )
                              )

RECEIVED
MAY - 6 2013
PRO SE OFFICE

## MOVANT'S REPLY TO GOVERNMENT'S RESPONSE

GROUND ONE: Defendant Dr. Rafiq Sabir was denied the effective
assistance of counsel in violation of the Sixth Amendment to the
United States Constitution. Defense counsel: 1) Misadvised
Dr. Sabir; 2) Failed to provide a translator as an expert witness;
3) Failed to properly cross-examine government witness. Further
explanation as per supporting facts and memorandum previously
submitted with 28USC §2255 motion.

Government's Response: Dr. Sabir agreed only to a "testimonial"
stipulation, i.e. that if called to testify, the translators
would have testified that their arabic-to-english translations
were accurate. As a result, the defense did not stipulate to
the accuracy of the translations.

Reply: The government failed to provide any counterargument to
Dr. Sabir's primary claim, which was Misadvice. Instead the
government chose to split hairs by attempting to make a distic-
tion where there is no distinction. Whether the stipulation was

"testimonial" or not is irrelevant; the relevant part is the
accuracy of the translation. The hair-splitting does not
change the effect, which was that the translations were
accepted as accurate with no challenge to it presented by
defense counsel Edward D. Wilford. Mr. Wilford knew that
Dr. Sabir did not say "al-Qaeda" when taking the bay'ah,
(religious ceremony) because Dr. Sabir told him that. There
is no doubt that undercover former FBI agent Ali Soufan said
"al-Qaeda" when leading Dr. Sabir in the ceremony; but Dr. Sabir,
who does not understand arabic, was merely attempting to repeat
the sounds he thought he heard, and so he did not say "al-Qaeda".
This is not difficult to realize for someone who knows arabic,
and so the mistranslation could not have been an error. Further-
more, the lead FBI agent on the case Brian Murphy understands
arabic and former FBI agent Ali Soufan is a native arabic
speaker, so both of them had to know that the translation was
inaccurate and improper. Therefore this reaches GROUND SIX,
Prosecutorial Misconduct, since the knowledge and testimony of
these agents was directly under the direction and control of the
prosecutors.

Dr. Sabir acknowledges the government's assertion that stipu-
lations, (as well as many other issues of trial management),
are the bailwick of defense attorneys, and therefore usually
involve strategic decisions. However, the government has not
proposed any possible strategy to explain why Mr. Wilford
would direct his client Dr. Sabir to sign the stipulation that

"the translators would have testified that their arabic-to-english translations were accurate", when Dr. Sabir told him he did not say "al-Qaeda", yet the translations stated that Dr. Sabir said "al-Qaeda". This was a major fact at issue, which defense counsel had his client stipulate away. If Dr. Sabir claimed at trial that he did not say "al-Qaeda", certainly the government would have objected and trotted out the stipulation; then the jury would have been instructed to disregard the testimony.

The Second Circuit favors stipulations when it comes to transcripts of tape recordings when there are disagreements as to what was actually said on the recording. It is well known that transcripts are not evidence; and it is also well known that when recordings are not clear juries will improperly rely on the transcript to inform them as to the content of the recording. In the instant case the recording was in arabic, and no one on the jury understood arabic; as such, it is highly probable that the jury improperly relied on the transcript to inform them of the contents of the recording. The sounds of arabic words are difficult to distinguish even for American english-speaking students of arabic; so english-speaking Americans with no training in arabic can easily misconstrue arabic terms. Dr. Sabir told Mr. Wilford that he did not say "al-Qaeda"; given the high likelihood that the jury could not distinguish the arabic sounds and so relied on the transcript, the effect of Mr. Wilford's

advice for Dr. Sabir to sign the stipulation was tantamount to Mr. Wilford having Dr. Sabir condemn himself. This was an easily foreseeable result, and, due to the gravity and devastating consequences, it was a critical stage of the trial.

If all of the jurors spoke arabic there would have been no need for a translation, and it would have been clear that Dr. Sabir did not say "al-Qaeda". On the other hand, if Mr. Wilford could speak arabic then he might have had a strategic or tactical reason for advosomg Dr. Sabir to sign the stipulation. However, neither the jurors nor Mr. Wilford nor Dr. Sabir understand arabic, so there could not possibly have been any strategic reason for Mr. Wilford to advise Dr. Sabir to sign the stipulation. The issue of the arabic-to-english translator as an expert witness for the defense was not, (as the government seems to think), to testify about Dr. Sabir's language skills; the expert was to listen to the recording and to tell the jury that Dr. Sabir did not say "al-Qaeda". Co-counsel Natali Todd promised Dr. Sabir before trial that an arabic language translator would be provided as an expert witness at trial, but none was provided. An arabic language expert would have been the only way that Mr. Wilford would have known whether or not Dr. Sabir said "al-Qaeda", yet he never even submitted a request for one in the court. With no arabic language skills Mr. Wilford advised Dr. Sabir to sign the stipulation, which ended up with the government falsely saying over and over that Dr. Sabir pledged support to al-Qaeda.

Even worse, Mr. Wilford presented the stipulation to Dr. Sabir suddenly in the courtroom and exerted undue pressure on Dr. Sabir to sign it immediately by saying it would "piss off the Judge" if he didn't sign it. Mr. Wilford abdicated his ethical and professional responsibility to Dr. Sabir by failing to fully explain the pros and cons of signing the stipulation. The only advantage expressed by Mr. Wilford was Dr. Sabir would avoid pissing off the Judge; Mr. Wilford never explained the downside, which was that the jury would improperly read, (incorrectly), that Dr. Sabir pledged support to al-Qaeda, even though Dr. Sabir told Mr. Wilford that he never said "al-Qaeda".

Finally, the government states that Dr. Sabir failed to produce as evidence an affidavit from as arabic language expert that he did not say "al-Qaeda". Such a requirement is unwarranted given that Dr. Sabir is in prison, financially destitute, and has access to neither an arabic language expert nor even the recording submitted into evidence. If Dr. Sabir had the means to retain counsel for his 28 USCS §2255 motion then it may have been possible to gain access to an arabic language expert and the recording entered into evidence to provide such an affidavit. Dr. Sabir asserted before trial to defense counsel Edward D. Wilford that he did not say "al-Qaeda", and it was then that the expert should have been retained and the affidavit produced. At the time of the bay'ah (religious ceremony), 20 May 2005 Dr. Sabir had no idea what he was saying. After his arrest he learned from former defense counsel Martin Stoler that he allegedly

said "al-Qaeda"; so when Dr. Sabir finally got the recording
in discovery he was able to listen to it repeatedly and to
determine that he did not say "al-Qaeda". At that point
while in solitary confinement and having been denied access to
the prison law library, he was left to rely totally on Mr. Wilford,
who inexplicably failed to request the arabic language expert
promised and then rushed Dr. Sabir into signing the stipulation
that provided the most damning evidence against him.

The government failed to provide any credible or legal counter-
argument on this issue; therefore, Dr. Sabir requests the Court
to grant summary judgment in his favor, with prejudice, barring
the government from retrying the case due to the associated
prosecutorial misconduct. (See also GROUND SIX.)

GROUND TWO: Defendant Dr. Rafiq Sabir was denied the effective
assistance of counsel in violation of the Sixth Amendment to the
United States Constitution. Defense counsel failed to challenge
the authenticity of the recording and provide an expert witness.

Government's Response: Defense counsel had no basis to
challenge authenticity... there is not one shred of evidence to
support...recording modified... Sabir does not even suggest how
it would be possible to "insert afterwards" the reference to
"bullets"...frivolous claims cannot constitute ineffective assistance.

Reply: Federal Rules of Evidence determine what procedures must
be followed in order to introduce evidence at trial. However,

before trial defense counsel has the right to examine evidence; as a result of that process defense counsel may request a hearing and present objections to a particular item to be profferred as evidence at trial. The Second Circuit has noted that recordings are particularly susceptible to tampering; and there have been recent cases where pretrial hearings were held on the admissibility of recordings simply based on the defendant's claim that there was tampering. In those cases the defendants retained experts to examine the recordings at issue so they were able to testify at the hearing regarding possible tampering.

The only people qualified to judge a recorded conversation are the participants and anyone else that may have been listening remotely in real-time. The prosecutors do not claim they were present nor that they were listening remotely, and therefore cannot judge the recording except through witnesses. Obviously, Dr. Sabir was a participant 20 May 2005, and due tothat is qualified to judge the recording from that date. In this instance the fact is a matter of Dr. Sabir's word versus that of former FBI agent Ali Soufan.

The admissibility of evidence is solely determined by the Judge. Before trial competency can be argued by determining whether or not tampering occurred, and such discussion can affect thejudge's determination of admissibility. Once the Judge rules for admissibility then that decision can only be reviewed under abuse of discretion. At trial competency of a recording is

determined by authentication by the person recording the
conversation or some other qualified person; once the recording
is in evidence then its contents are only assessed for the
weight of the evidence, which is the provence of the triers
of fact.

As a participant in the conversation, Dr. Sabir was readily able
to determine that a phrase about "bullets" was inserted into
the recording. He immediately notified defense counsel and
requested an expert to analyze the recording. Clearly, this
sequence is not unique to the present case. The issue here is
ineffective assistance of counsel, and not abuse of discretion.
As this sequence is not unique, and Dr. Sabir indicated
specifically what had been altered, and that alteration contri-
buted to Dr. Sabir's conviction, defense counsel was ineffective
for not even doing the slightest investigation. Had he done so
and requested a pretrial hearing regarding the admissibility of
the recording, then all or part of the recording could have been
deemed inadmissible by the Judge.

In none of the previous cases where defendants claimed
tampering was the defendant asked to explain how the tampering
may have occurred. Simply proving that tampering occurred should
be sufficient, but to satisfy the government's query the answer
is quite simple. First the court has acknowledged that recordings
ar susceptible to tampering. In the time of linear cellophane

recording devices, a splice could be made and a new recording made from that. Today it is difficult to even discuss what is the "original recording", which is what is supposed to be used at trial. Recordings are often done on computer chip and uploaded for storage. It is common knowledge that a process called "photoshop" can alter photographs and videos to create images that never occurred. Likewise, computers can be used to "insert" statements that never occurred into conversations recorded on computer chip. Like photoshopped images, an expert may be able to determine whether or not tampering occurred in such a recording.

This is not a frivolous issue. Had Mr. Wilfor consulted an expert and showed that the phrase complained about had been inserted, then it would have considerably weakened the government's case. Dr. Sabir was a board certified internist and had no training or experience in treating gunshot wounds. That was part of Dr. Sabir's defense, but the government's claim that undercover former FBI agent Ali Soufan discussed "bullets" with Dr. Sabir 20 May 2005 unreasonably trumps that defense. When Defense counsel neglects a key part of his client's defense by failing to investigate that defense then he has not provided effective assistance of counsel. Conversely, had Mr. Wilford consulted an expert and shown that tampering had occurred then that would have been prosecutorial misconduct, as claimed in GROUND SIX; certainly, none of this is frivolous.

The government utterly failed to present counterarguments to Dr. Sabir's claim; as a result, Dr. Sabir asks for summary judgment in his favor on this issue.

GROUND THREE: Defendant Dr. Rafiq Sabir was denied the effective assistanc of counsel in violation to the Sixth Amendment to the United States Constitution. Defense counsel failed to investigate, prepare a defense, and call expert witnesses requested by Dr. Sabir.

Government's Response: Expert testimony would be inadmissible, unhelpful, or both. The government argued that, by emphasizing his mobility to move around... he was free to come to mujahiddeen.

Reply: During jury selection the government successfully argued to excuse several potential jurors for cause based on the fact that they watched CSI, because those jurors would have had an unrealistic expectation of evidence at trial- the so-called "CSI effect". Now the government wants to claim that witnesses who could explain to the jury that Dr. Sabir could not have treated combat injuries would have been "inadmissible or unhelpful or both." In other words, one cannot have jurors with unrealistic expectations of lawyers, but its okay for jurors to have unrealistic expectations of doctors. As long as there have been courts medical experts have been testifying to inform the triers of fact on issues in which they (jurors) have no expertise. There is no shortage of cases in criminal trials that have been reversed due

to defense counsel's failure to call medical experts.  These
multitudes of cases fly against the government's unreasonable
and unfounded and unexplained claim that such testimony would
have been "inadmissible, unhelpful, or both."

Recent tragedies at Sandy Hook Elementary School in Connecticut
and at the Boston Marathon show quite conclusively the very point
Dr. Sabir needed to have made to the jury- that combat injuries
cannot be treated by an internist- not in an apartment and not
anywhere else.  People die from a single bullet in a limb unless
they are taken immediately to a trauma center where doctors and
nurses specialized in trauma are available, with multiple and
various specialists on hand and operating room and intensive care
availability.  The jury thinks, incorrectly, from television
shows that any doctor can do this.  Mr. Wilford made a weak
attempt at obtaining experts by improper means, (a letter rather
than a motion), just before trial to reques the specialists; and
he did not explain in his letter how it was a key part of
Dr. Sabir's defense.  Had Mr. Wilford properly requested the
experts through a motion, explaining how it was a key part of
the defense and giving the government an opportunity to challenge
it, then there would have been no complaint of ineffective
assistance of counsel in this regard.

The government did not present any credible or legal argument
against Dr. Sabir's claim of ineffective assistance on this issue.
Therefore, Dr. Sabir asks the Court to grant summary judgment in
his favor on this issue.

GROUND FOUR: Defendant Dr. Rafiq Sabir was denied the effective assistance of counsel in violation to the Sixth Amendment to the United States Constitution. Defense counsel failed to object to hearsay testimony.

Government's Response: Arguing the Hearsay Exception.

Reply: Mr. Samuel Nelson, a.k.a. Umar, testified at trial that Dr. Sabir was going to pay for a warehouse in Long Island for co-defendant Tarik Shah to teach martial arts. Due to this testimony Dr. Sabir was convicted of aiding and abetting; there was no other evidence presented at trial for this charge. At trial the government did not claim that this testimony came under the Hearsay Exception Rule, so it cannot be argued as such now.

The government failed to address all arguments made by Dr. Sabir in the attached memorandum with his 28 USCS §2255 motion on this point. Firstly, Mr. Shah had no knowledge of the warehouse in Long Island when the alleged statement was made (in 2002 or 2003). Secondly, om closing arguments the government stated that the conspiracy began in March or April 2004. These two facts mean Mr. Nelson's allegation could not come under the Hearsay Exception, even if the government wishes to argue that after the fact. Thirdly, Dr. Sabir was in Florida and did not visit Mr. Shah and Mr. Nelson at all during the time when the alleged statement was made; consequently, at best Mr. Nelson's statement only could have been double hearsay, which is impermissible. Mr. Wilford was ineffective for failing to object to this obviously impermissible

hearsay, which led to conviction of Dr. Sabir for aiding and abetting.

Since the government failed to address Dr. Sabir's claims with respect to this issue, Dr. Sabir asks the Court for summary judgment in his favor on this issue and to reverse the conviction for aiding and abetting.

GROUND FIVE:  Defendant Dr. Rafiq Sabir was denied the effective assistance of counsel in violation of the Sixth Amendment to the United States Constitution.  Defense counsel 1) Failed to request a mistrial and 2) Failed to argue abuse of discretion on appeal.

Government's response:  Claim that District Court erred was waived because it was not raised on appeal, and is not cognizable on habeas... newspapers are "self-authenticating" and therefore "were not hearsay". Sabir also complains that testimony by Yahya Muhammad...prejudicial. Issue regarding Chapman and Tamimi "frivolous appeal point" and so "cannot be ineffective".

Reply:  Dr. Sabir complained of three issues of abuse of discretion. Abuse of discretion occurs when the court makes an incorrect ruling based on an incorrect view of the law or based on an incorrect assessment of the facts.  Abuse of discretion is reviewed for plain error.

The first issue was allowing into evidence numerous recorded conversations between co-defendant Tarik Shah and either the confidential informant or the undercover FBI agent under the Hearsay Exception

Rule FRE 801(d)(2)(E). This requires that the court find by a preponderance of the evidence that a conspiracy existed at the time of the statements, that the defendant was a member of the conspiracy, and that the statements were made in furtherance of the conspiracy. At trial the Court erred when it ruled that these three criteria had been satisfied, when it was plainly clear that the first element had not been satisfied. In its response to Dr. Sabir's complaint the government did not address any of the facts that Dr. Sabir mentioned which plainly show that a conspiracy could not have existed at the time of the over-whelming majority of the recordings. Even if the government tried to argue that the error was not plain, it should have been obvious to the Court that it was in error after the government stated in closing arguments that the conspiracy began in March or April 2004, after most of the recordings were made. Given that statement, there was no possible way that the Hearsay Exception Rule could have been applied to admit the recordings. Consequently, defense counsel failed to provide effedtive assistance of counsel when he failed to move for a mistrial due to the quantity of prejudicial evidence incorrectly admitted into evidence. And defense counsel failed to provide effective assistance of counsel on appeal when he failed to argue a "dead-bang winner" on appeal, which was abuse of discretion.

This is also an instance of prosecutorial misconduct because the government misrepresented the facts when proffering the recordings under the Hearsay Exception Rule. The government had two years to prepare for trial, and so it had to have known when the evidence

was profferred that it could not have legitimately established
by a preponderance of the evidence that a conspiracy existed at
the time that the overwhilming majority of the recordings were
made.

The government failed to respond to Dr. Sabir's ineffective
assistance of counsel claim that defense counsel did not argue
abuse of discretion, a "dead-bang winner" on appeal; and the
government utterly failed to respond to or even notice Dr. Sabir's
ineffective assistance claim that defense counsel failed to move
for a mistrial when it became unequivocally clear in the govern-
ment's closing argument that massive quantities of highly preju-
dicial recordings were incorrectly admitted into evidence under
the Hearsay Exception Rule. Because of the government's failure
to respond, Dr. Sabir asks for summary judgment in his favor on
this issue with prejudice, barring the government from retrying
the case due to its flagrant misconduct on this issue.

The second issue of abuse of discretion claimed involved improper
admission into evidence of alleged newspapers. The Court made
this erroneous ruling based on its erroneous assessment of the
facts. The government points out that newspapers are "self-authen-
ticating", which is irrelevant in this case. From the banc the
Court could plainly see that the prosecutor was not entering any
"newspapers" into evidence. The papers were separate sheets of
8½" x 11" copy paper or printer paper, and therefore could not
possibly have been any newspaper, and could not have been "self-
authenticating". This was a plain and obvious error, since such

copy paper would not withstand any competency evaluation in the
manner in which it was offered at trial.

The government failed to respond to these and other arguments
made by Dr. Sabir in his 28 USCS §2255 motion regarding the
relevance of these supposed "newspapers" to Dr. Sabir's guilt;
nor has the government made any attempt to argue the unfair
prejudice claimed byDr. Sabir that occurred as a result of the
Court's erroneous ruling. Dr. Sabir asserts that the defense
counsel was ineffective for failing to argue this on appeal;
consequently, Dr. Sabir asks the Court for summary judgment in
his favor on this issue.

The third issue of abuse of discretion raised by Dr. Sabir in
his 28 USCS §22||| motion was testimony allowed by the Court about
Umar Abdur-Rahman, (the "Blind Sheikh"), Seifullah Chapman, Ali
Tamimi, and Mahmoud "Brent" al-Mutazzim. Admissible evidence is
that which is mor likely to make a fact more or less probable,
and the fact is of consequence in determining action. FRE 401.

The government responds by incorrectly stating that Dr. Sabir
complained about testimony of Yahya Muhammad; it also states
Sabir cannot establish that failure to appeal discussion of the
"Blind Sheikh" should have been excluded, and that an appeal
regarding discussion of Seifullah Chapman and Ali Tamimi is
"frivolous". The government did not respond to Dr. Sabir's claim
that testimony on Mahmoud "Brent" al-Mutazzim should have been
excluded, and should have been argued on appeal.

The admissibility of evidence is defined by Federal Rule of Evidence 401, 402, 403. Clearly, the overriding factor is Rule 104, which is that it is a matter of judicial discretion, so all errors of admissibility of evidence must be evaluated under the abuse of discretion standard.

Rule 403 provides for excluding relevand evidence for prejudice, confusion, waste of time, or other reasons. More specifically, the court may exclude relevant evidence if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issue, misleading the jury, ... or needlessly presenting cumulative evidence. The Notes of Advisory Committee on Rules under Rule 403 states that "certain circumstances call for exclusion of evidence which is of unquestioned relevance. These circumstances entail risks which range all the way from inducing decision on a purely emotional basis, at one extreme, to nothing more harmful than merely wasting time. And that "unfair prejudice" within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.

Stephen A. Saltzburg, et. al. further discuss Rule 403 in an accompanying commentary under the heading "presumption of admissibility". They describe "unfair prejudice" as "an undue tendency to suggest a decision on an improper basis... emotion or irrational decision or to use the evidence in a manner not permitted by the rules of evidence.

They cite U.S. v. Kizeart 102 f.3d 320 (7thCir. 1996) to say that "Evidence is cumulative 'when it adds very little to the probative force of the evidence in the case... contribution to the determination of truth would be outweighed...[by the] potential for confusion as well as prejudice..." They note that "Error will be found only if the Trial Judge's decision cannot be supported by reasonable argument." (Citing U.S. v. Coiro 922 f.2d (2nd Cir 1987).)

Saltzburg, et. al. then mention a list of factors to consider in deciding whether or not to exclude evidence:

1) Power to exclude, citing U.S. v. Finestone 816 f.2d 583 (11th Cir 1987) "Rule 403 provides extraordinary remedy that should be used only sparingly, and consequently the Trial Judge's discretion to exclude evidence is more limited than is the discretion to admit evidence."

2) Credibility- Trial Judge must assess the probative value of the evidence if believed by the jury and balance that against the risk of prejudice.

3) Balancing process on the record.

4) Prejudice must be properly analyzed.

Citing U.S. v. Figueroa 618 f.2d 934 (2nd Cir 1980) they state that "Limiting instructions in controlling prejudice must be considered by the Trial Court when balancing probative value and prejudice under Rule 403." And that "The Trial Judge must determine whether a limiting instruction is sufficient protection against the dangers addressed by this Rule to tip the scales in favor of admission." See Government of Virgin Islands

v. Pinney 967 f.2d 912 (3rd Cir 1991), noting that "in some situations there may be an unacceptable risk that jurors cannot follow limiting instructions."

Dr. Sabir begins his argument of abuse of discretion on this point by arguing relevance. All discussion of Rule 403 begins with excluding relevant issues, so since the government failed to even argue the relevance of the testimony regarding "the Blind Sheikh", Seifullah Chapman, and Ali Tamimi, it has not attempted to nor can it possibly win this argument. The essential fact noted by Dr. Sabir in these instances is that he did not even know any of them, so discussing them could not possibly prove any fact relevant to his guilt, (which was what the government was required to prove at trial). Therefore , the evidence offered by testimony on those individuals did not even satisfy the require- ments of Rule 401, and violated Rule 402 which states "Irrelevant evidence is not admissible".

Even if that testimony could have been deemed "relevant" (which it could not have), then still it should not have been permitted based on unfair prejudice and cumulativeness, i.e. "it adds very little to the probative force of the evidence..." Already the government unnecessarily repeatedly discussed the acts of terror- ism committed by al-Qaeda at trial, including the destruction of the World Trade Center towers, attacks on U.S. embassies in East Africa, and the attack on the U.S.S. Cole. The discussion about the "Blind Sheikh" added absolutely nothing to probative value of evidence against Dr. Sabir, while it was clearly unfairly

Prejudicial, (i.e. tending to suggest decision on an improper basis... emotional one), and cumulative to extensive discussion on terrorism preceeding it. U.S. v. al Moayad 545 f.3d 139 (2nd Cir 2008).

Similarly discussion of Seifullah Chapman did not prove a single fact against Dr. Sabir; it could not possibly have shown Dr. Sabir's state of mind or anything else since Dr. Sabir did not know him, and only heard of a reference to Chapman regarding a conviction involving paint ball games. Dr. Sabir did not know anything of the actual facts of the case and still does not know. Dr. Sabir never even heard of Ale Tamimi until he was provided information about him either at trial or in pretrial discovery. At trial and on appeal the government improperly inferred knowledge of these two individuals from the fact that co-defendant Tarik Shah seemed to know them. To further infer that from such an infer-ence that one could infer Dr. Sabir's state of mind is not accept-able under the Rules of Evidence. All of this is manifest error, and because of the unfairly prejudicial effect, allowing the testimony into evidence is abuse of discretion. As such counsel was deficient for failing to properly argue the issue at trial and failing to argue abuse of discretion on appeal. Due to the fact that there was absolutely no probative value in these testimonies regarding Dr. Sabir these arguments would have been "dead-bang winners" on appeal.

The government failed to address any of these arguments made by Dr. Sabir in his 28 USCS §2255 motion in its response; and the

government did not even mention in its response Dr. Sabir's claim that testimony on Mahmoud "Brent" al-Mutazzim was nonprobative and highly prejudicial. Consequently, Dr. Sabir asks for summary judgment in his favor on this third issue of abuse of discretion with prejudice due to the government's misconduct on this issue with regard to testimony and statements of the prosecutor about Mahmoud "Brent" al-Mutazzim.

GROUND SIX: Defendant Dr. Rafiq Sabir was denied the effective assistance of counsel in violation of the Sixth Amendment to the United States Constitution. Defense counsel failed to object to numerous instances of prosecutorial misconduct.

Government's Response: The government mentions an "incident report"...Mahmoud "Brent" al-Mutazzim was in the car; report was never seen by the jury. Regarding the Establishment Clause... these activities are not legislative... it appears Sabir's claim ...government committed misconduct by implying that Islam is an inferior religion. At no time did the government offer evidence or argument that Islam is inherently bad... essentially a sufficiency argument. Regarding takiyyah- "Once Sabir said he was not familiar with that... the government moved on."

Reply: The government is represented in court by attorneys, who must be held to the same standards that any other attorney must follow. Unethical and erroneous activities that result in the deprivation of rights of defendants in criminal trials constitute

prosecutorial misconduct. Defense counsel has an obligation to be
vigilant and to object when such offenses occur at trial; when
defense counsel fails to object to improper conduct of the govern-
ment counsel that results in unfair prejudice against his or her
client, then that attorney has failed to provide effective assist-
ance. When a pattern of misconduct so infects the integrity of
the proceedings as in this case then a grant of habeas relief is
warranted even if it did not substantially influence the jury's
verdict. Brecht v. Abrahamson 507 U.S. 619 (1993). Then the
government should be barred from re-trying the case.

The instant case is rife with prosecutorial misconduct, much of
which is plainly obvious, and some of which would have been plain
had defense counsel provided effective assistance of counsel by
doing the investigations requested by the defendant Dr. Rafiq Sabir.
Because there were so many instances of misconduct Dr. Sabir chose
to focus only on what he perceived to have been the most egregious.
Even these few the government failed to provide an adequate response
to any of them, and even added further instances of unethical
behaviour in those responses.

A) The government erred in claiming Dr. Sabir pledged support to
al-Qaeda. The government chose not to respond to this charge.
Dr. Sabir wished to be generous and to avoid using blatant
terminology in referring to the government's behavior in this
instance, but the behavior could only have been intentional and in
complete disregard of the truth. "The prosecutor has an independent
duty to correct testimony he knows is false" and if there is

"any reasonable likelihood... could have affected the jury" the conviction must be set aside. Napue v. Illinois 360 US 264 (1959); U.S. v. Agurs 427 US 97 (1976).

The government's claim at trial was that Dr. Sabir pledged support to al-Qaeda through an Islamic religious ceremony called "bay'ah" that was led by undercover former FBI agent Ali Soufan, who is a native speaker of arabic. The lead FBI case agent Brian Murphy speaks arabic as well. Two FBI translators were assigned to translate the arabic portions into enlish. It would have been impossible for a mistranslation of what <u>Dr. Sabir</u> said in the bay'ah to have occurred accidentally or by simple error. Dr. Sabir informed defense counsel that he did not say "al-Qaeda", and he had no idea that is what he was supposed to have been saying in the bay'ah. This is Dr. Sabir's word versus the government's word, and Dr. Sabir was not afforded the opportunity to provide expert testimony at trial to support his claim due to ineffective assistance of counsel. Nevertheless, Dr. Sabir is positively certain as to his claim, yet to be proven; given that opportunity, the resulting effect would be to prove prosecutorial misconduct of such magnitude as to require reversal and barring retrial because the government provided false information to mislead the jury and to convict an innocent man.

Due to the government's failure to respond, Dr. Sabir requests an evidentiary hearing on this issue to prove his point. Dr. Sabir has no access to any arabic language expert while in custody and has no access to the recording in evidence. If he is appointed

counsel and an arabic language expert is provided for and eviden-
tiary hearing, and Dr. Sabir is given access to the recording,
then his point will be made. Following that Dr. Sabir would
request summary judgment on this issue in his favor, with preju-
dice, barring the government from retrying the case.

B) The government erred in claiming Dr. Sabir understood arabic.
This is not a relitigation argument. The jury members did not
understand arabic, and so they could not have possibly made a
judgment that Dr. Sabir understood arabic except by taking the
word of the prosecutors. The recorded conversations tell a different
story: 1) Tarik Shah plainly told both Ali Soufan and the confi-
dential informant on recorded conversation that Dr. Sabir did not
understand arabic. The government claimed that testimony about
Seifullah Chapman and Ali Tamimi were used to prove that Tarik Shah
speaks the truth; yet here the government chooses to ignore Mr. Shah's
candid statements in this regard; ||) Ali Soufan felt it necessary
on 20 May 2005 to explain in english to Dr. Sabir what was alleged
to have been said in arabic; that would have been unnecessary had
Mr. Soufan believed Dr. Sabir understood arabic.

This is prosecutorial misconduct issue because despite these facts
elicited at trial the government falsely asserted to the jury that
Dr. Sabir understood arabic. Defense counsel failed to present to
the jury the evidence that Dr. Sabir did not understand arabic, and
he failed to object to the improper conclusory statements of the
government throughout the trial and in closing arguments, supplant-
ing the role of the jury, that Dr. Sabir understood arabic and

did not present any reasonable basis for that claim. It was an expert opinion offered by the government without any expert testimony.

At trial Dr. Sabir admitted to knowing religious phrases and a few terms that he learned to help him function in limited situations while in Riyadh, but never claimed that he understood arabic. Dr. Sabir prays in arabic as is required by his religion; and Dr. Sabir reads al Qur'an in arabic as well, without understanding arabice, as do literally millions of other Muslims world-wide. Dr. Sabir learbed the arabic alphabet in order to help him pray better, and did not study the language until after his arrest on the instant charges. It should not take an expert to see that knowledge of the alphabet and praying in arabic is a far cry from understanding arabic.

The evidence from recorded conversations show that Dr. Sabir does not understand arabic. The only statements otherwise are from the prosecutor improperly acting as an expert and in contradiction to the government's own evidence. The government's assertions were patently false and baseless, and so constitutes misconduct with the intent to mislead the jury. Thus Dr. Sabir asks for summary judgment in his favor, with prejudice, and barring the government from retrying the case.

C) The government presented a falsified arrest record at trial, and in responding to the charge the government compounds its

dishonesty by saying it was an "incident report". At trial, when Dr. Sabir was on the witness stand the prosecutor asked before the jury in a stentorian voice, "When you were <u>arrested</u> in Beacon, New York..." This was a blatant lie that reached the ears of all the jurors as well as the gallery. Then, to prove its point the prosecutor handed a document to Dr. Sabir that was entitled "Arrest Record" and asked Dr. Sabir to read it. Under these circumstances it doesn't matter whether or not the jury "saw" the document- they heard its title by the speech of the prosecutor and they heard its contents when the prosecutor asked Dr. Sabir to read it.

Even in responding, the government blatantly lies further because it did not call the document an "incident report" at trial. Further-more, Dr. Sabir has submitted into evidence the results of his own background check on himself from Beacon, New York. The alleged "arrest record" or "incident report" presented at trial is not there. The only "incident report" in that background check does not involve a traffic stop and does not involve any contact between Dr. Sabir and the Beacon Police Department whatsoever.

In addition, the government in responding continues to lie by insisting that Mahmoud "Brent" al-Mutazzim was in the car with Dr. Sabir at the time of their fictitious "arrest record" or "incident report". The government should produce the document so that the court can determine for itself that al-Mutazzim was not mentioned in the falsified report. Also Dr. Sabir provided as evidence a letter from al-Mutazzim stating that he never met

Dr. Sabir before meeting him on the instant case, so he could not have been in Dr. Sabir's car during the fictitious "incident" or "arrest".

The government also bahaved unethically when the prosecutor told the Judge at trial "I interviewed the <u>arresting</u> officer myself." This is highly offensive to the Court and indicates the prosecutor's extreme lack of integrity and disregard for the truth. Yet on top of that the government completely omits the fictitious story presented to the jury surrounding that fictitious arrest. The government claimed, without a shred of proof, that Dr. Sabir and Mahmoud "Brent" al-Mutazzim watched the al-Qaeda propaganda video "Martyrs of Bosnia" with co-defendant Tark Shah the night before the fictitious "incident" or "arrest". This video was mentioned by the government expert witness on al-Qaeda as the means by which Dr. Sabir supposedly knew he had to sacrifice everything for al-Qaeda, nullifying Dr. Sabir's argument that he would be barred by religious ethics from participating in terrorism. Then the government actually showed the video to the jury, adding unfair prejudice on top of unfair prejudice. Defense counsel, incredibly, was completely silent throughout this fiasco.

Dr. Sabir asks for summary judgment in his favor on this issue, with prejudice, barring the government from retrying the case.

D) The government intentionally misled the Court about the onset of the alleged conspiracy in order to circumvent Dr. Sabir's Sixth Amendment Right to Confrontation. The government offered

numerous recorded conversations involving co-defendant Tarik Shah under the Hearsay Exception Rule 801 (d)(2)(E). Then in closing arguments the govenment said the conspiracy began in March or April 2004, <u>after</u> the overwhelming majority of recordings were made. In responding the government now alleges there was another conspiracy going back to 1990's; this fails because no such argument was presented at trial and no evidence was ever presented to prove it. Even if it were allowed then it would bring up countless other issues, such as: 1) Amendment of the indictment; 2) confusion between the two alleged conspiracies; 3) which actions were part of the first alleged conspiracy and which are part of the second; each of these questions is a Pandora's Box that only further destroys the government's allegations.

The ultimate conclusion is the government knew before trial that it could not admit the recordings except through the Hearsay Exception Rule; and that the evidence would only allow establishing the onset of the alleged conspiracy from March or April 2004. Therefore, the government fraudulently asserted that the alleged conspiracy began earlier in order to circumvent Dr. Sabir's Right to Confrontation. This is clear prosecutorial misconduct and clear cause for reversal. Defense counsel never objected nor requested a mistrial nor argued this issue in any way on appeal. Thus Dr. Sabir asks for summary judgment in his favor on this issue with prejudice, barring the government from retrying the case.

E) The government violated the Establishment Clause of the First
Amendment repeatedly, and then continued to do so in its response
to Dr. Sabir's complaint. The government's rationale is they are
not legislating and the government did not offer evidence or argu-
ment that Islam is inherently bad. Clearly, neither of these
defenses is supported by the Supreme Court. While the First
Amendment is stated in terms of legislation, case law shows that
how legislated laws are carried out can  also be considered a
violation of the Establishment Clause. The most serious violations
involve issues of belief, (as opposed to issues of conduct), and
consequences that involve criminal prosecution. Dr. Sabir was
convicted in large part by the government telling the jury that
Dr. Sabir's religious beliefs indicated he had a criminal mindset.

At trial the government stated emphatically that Islam was not on
trial; but the government's statements and inferences belied that
claim. The government sought to distinguish its attack on Dr. Sabir
from Islam by claiming that Dr. Sabir did not follow "mainstream
Islam". This a difference with no distinction. The government
had no expert witness testify that Dr. Sabir's beliefs differed
from mainstream Islam, and even if it did differ, the govenment
did not produce any evidence at trial what Dr. Sabir's religious
beliefs were and how they might have proven a relevant issue of the
crime charged. Without any testimony as to what is mainstream
Islam, and how those differences added something relevant to the
matter of guilt, everything the government said about Dr. Sabir's
beliefs and about Islam was improper and constituted prosecutorial
misconduct because it violated the First Amendment Establishment

Clause.

Outside of the trial a good question to ask is whether any aspect of Islam or of Dr. Sabir's beliefs can be considered as contributing to a mindset to commit a crime. Some of the things in Dr. Sabir's beliefs cited by the government as evidence of a criminal mindset include belief in Jihad,[*] belief in Hijrah,[**]belief in learning horseback riding, learning archery; none of this is deviant from mainstream Islam, and none of it has ever been shown to have been evidence of criminal intent. The government's statements at trial that Dr. Sabir did not follow mainstream Islam was mere conjecture and the prosecutor acting as his own expert; both of these acts are not permissible, and defense counsel failed to object to it.

Specific acts that the government demonized at trial included use of the term "sheikh", the name "Osama", the use of kunya,[***]the term "mujahiddeen", possession of archery equipment, owning Islamic history books, reading a passage of Islamic history to a group, planning to move to the Catskill Mountains. None of this indicates criminal intent. The government incorrectly informed the jury "Sheikh Osama" can only mean Osama Bin Laden. This is an Islamic issue, and not something specific for Dr. Sabir. The government classified "kunya" as alias, when in Islam every day world-wide it is commonly used for completely innocent purposes. The government used "mujahiddeen" synonymously with "terrorist", while mainstream Islam recognizes this as a necessity of life, and does not

---

[*] Jihad meaning struggle, often applied to war fought by mujahiddeen.
[*] Hijrah meaning migration for the sake of Allah, seeking purity.
[*] Kunya meaning a name denoting lineage, such as Abu or Ibn in a name.

equate it with "terrorists". In Islam terrorism is a crime, but jihad and those who fight jihad, (mujahiddeen), is not criminal. The jury was terrified by 11 September 2001, and so everything Islamic is suspicious to them. The government's comments and inferences that Dr. Sabir's beliefs and actions, which are acceptable in Islam, indicate criminal intent served only to confuse the jury through misinformation and fanning the flames of prejudice in order to cause the jury to convict Dr. Sabir on a basis other than the facts.

The end result, besides convicting Dr. Sabir, is to inform all Muslims that if they believe as Dr. Sabir believes or do or say any of the things Dr. Sabir did or said, (which was all innocent and all religiously motivated), then you can be prosecuted and convicted as a terrorist. This has an extreme chilling effect on Islamic religious beliefs and expression. The epitome of this sanction was the proscription of the bay'ah. The government informed the jury incorrectly that this is not part of mainstream Islam, and that the use of arabic itself is part of secret agreements to destroy America. There is nothing inherently secret or inherently suspicious about bay'ah, and it is a religious pledge based on religious concerns for the Islamic belief in the Day of Resurrection and Judgment Day before God. What was a religious ceremony was turned into a farce and a ruse to falsely convince the jury that Dr. Sabir wanted to join al-Qaeda. Dr. Sabir trusted undercover former FBI agent Ali Soufan because he trusted co-defendant Tarik Shah, so he was deceived. Now the jury and the Court will be mindful that bay'ah

is associated with terrorism. Another valid Islamic religious
ritual has been successfully demonized.

Finally, the government dismissed Dr. Sabir's complaint that it
committed misconduct by asking Dr. Sabir about Takiyyah (or
Taqiyyah) by falsely stating that it passed on when Dr. Sabir
said he didn't know about it. The government did not acknowledge
its next question: "Doesn't it mean that a Muslim is allowed to
lie under oath?" This was a flagrant violation of the Federal
Rules of Evidence 610 because that question was a very thinly
disguised attack on Dr. Sabir's credibility through a religious
question. This is a shiite belief, and Dr. Sabir is Sunni Muslim,
so it was inapposite; in any event, it informed the jury not to
believe anything Dr. Sabir said, inferring that lying under oath
was part of Dr. Sabir's religious beliefs. Defense counsel
remained silent at the time of this egregious violation, and so
failed to provide effective assistance of counsel.

In summary, the government engaged in a full-scale assault on
Islam, claiming that it was not Islam being attacked and that
Dr. Sabir's beliefs differed from mainstream Islam without any
expert testimony or other proof for that conclusion. All Muslims
were put on notice to avoid Dr. Sabir's beliefs or face arrest,
prosecution, and imprisonment. This is the worst possible violation
of the First Amendment Establishment Clause- attacking beliefs
with the threat of criminal prosecution. The government did not
respond at all to these complaints, and therefore Dr. Sabir asks
for summary judgment in his favor, with prejudice, barring the
government from retrying the case.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RAFIQ SABIR, MOVANT                )        12 Civ. 8937 (LAP)
                                   )
                                   )
         v.                        )        05 Cr. 673-2 (LAP)
                                   )
                                   )
UNITED STATES OF AMERICA           )
                                   )
                                   )

---

### AFFIRMATION OF SERVICE

I, Rafiq S. Sabir, declare under penalty of perjury that I have

served a copy of the attached MOVANT'S REPLY TO GOVERNMENT's

RESPONSE

upon the United States Attorney, whose address is

>           Unite States Courthouse Annex
>              One Saint Andrews Plaza
>           New York, New York 10007-1701

by First Class Mail.

Dated:  Ashland, Kentucky

        29 April 2012



Signature

Federal Correctional Facility

Post Office Box 6001

Ashland, Kentucky 41105

PRO SE OFFICE

MAY - 6 2013

RECEIVED

U.S. Postal Service™
CERTIFIED MAIL™ RECEIPT
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

OFFICIAL USE

RAFIQ SABIR
55312-066
R-Unit

Certified Fee

Return Receipt Fee
(Endorsement Required)

Restricted Delivery Fee
(Endorsement Required)

Total Postage & Fees    $

Postmark
Here

Sent To    United States District Court
Southern District of New York
Street, Apt No;    500 Pearl Street
or PO Box No.    New York, New York 10007

PS Form 3800, August 2006    See Reverse for Instructions

CERTIFIED MAIL™

7012 3050 0000 8078 7570
7012 3050 0000 8078 7570