UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

RAFIQ SABIR,                                     :

          Movant,                            :

-v.-                                             :        12 Civ. 8937 (LAP)

UNITED STATES OF AMERICA,                        :        05 Cr. 673 (LAP)

          Respondent.                        :

------------------------------------------------------------X


## MEMORANDUM IN OPPOSITION TO DEFENDANT RAFIQ SABIR'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF HIS MOTION PURSUANT TO 28 U.S.C. § 2255


JOON H. KIM
Acting United States Attorney
Southern District of New York
Attorney for the United States
  of America


KARL METZNER
Assistant United States Attorney
- Of Counsel –

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................... 1

PROCEDURAL HISTORY .......................................................................... 1

FACTUAL BACKGROUND .......................................................................... 3

    A.    Sabir's Offense Conduct ......................................................... 3

    B.    Sabir's 2255 Motion of November 30, 2012 ........................... 5

    C.    Sabir's May 2017 Memorandum ............................................ 5

ARGUMENT ........................................................................................... 6

    A.    Applicable Law ...................................................................... 7

        1.    Statute of Limitations .................................................. 7

        2.    Procedural Default ...................................................... 8

    B.    Discussion ............................................................................ 11

        1.    Sabir's Claims Based on Shah's Affidavit Are Time-Barred ..... 11

        2.    Shah's Affidavit Does Not Prove Sabir's "Actual Innocence" .... 13

        3.    Sabir's Arabic Proficiency Was Not A Material Issue At Trial.. 16

        4.    Shah Had A Valid Fifth Amendment Privilege .......................... 17

        5.    Any Exculpatory Information From Shah Was Immaterial ...... 18

CONCLUSION ......................................................................................... 19

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in opposition to the memorandum of law ("Mem.") filed by Rafiq Sabir on or about May 22, 2017, in support of his pending motion under Title 28, United States Code, Section 2255, to vacate his sentence. Sabir claims that testimony from his co-defendant Tariq Shah, with whom he was charged in December 2006, qualifies as newly-discovered evidence and shows his actual innocence. It does neither, and so that claim is both time-barred and meritless. Sabir also reiterates some of his claim of ineffective assistance of counsel regarding Sabir's level of Arabic proficiency, to which the Government responded in its initial response on April 18, 2013. Sabir makes a new allegation of prosecutorial misconduct regarding a supposed disclosure issue, which, although factually baseless, could not have made a difference even if true. To avoid unnecessary repetition, the Government respectfully requests that this opposition be considered in conjunction with the Government's April 13, 2013 submission. (Crim. Dkt. 193).

## PROCEDURAL HISTORY

Superseding Indictment S4 05 Cr. 673 (LAP) was filed against Sabir and three others on December 6, 2006, charging Sabir in two counts with conspiring to provide, and attempting to provide, material support to al Qaeda, in violation of 18 U.S.C. § 2339B. Trial commenced on April 27, 2007 and ended on May 21, 2007, when Sabir

was convicted on both counts. On November 28, 2007, Sabir was sentenced principally to 300 months' imprisonment.

Sabir filed a direct appeal with the United States Court of Appeals for the Second Circuit. In an opinion dated February 4, 2011, that court rejected all of Sabir's claims and affirmed his conviction. *United States* v. *Farhane*, 634 F.3d 127 (2d Cir. 2011). Sabir then moved for rehearing and rehearing *en banc*, which was denied by the Second Circuit on May 12, 2011. Finally, Sabir sought a writ of certiorari in the United States Supreme Court, which was denied on December 5, 2011. Sabir affirms that he submitted his habeas motion to the prison mail system on November 30, 2012. The Government opposed Sabir's motion on April 13, 2013. (Crim. Dkt. 193).

After filing his initial motion, Sabir filed a number of variously-styled motions and efforts to supplement or amend his pending motion, and for other relief. By order dated July 29, 2016, this Court directed the Government to respond to nine of those submissions. (Civ. Dkt. 29). However, on September 7, 2016, Charles D. Swift, Esq. entered an appearance on Sabir's behalf. (Civ. Dkt. 32). In conjunction with that appearance, Mr. Swift asked for leave to file a memorandum of law on Sabir's behalf, explicitly requesting that the issues raised in that memorandum be considered in lieu of the "several ancillary motions" Sabir had filed pro se since filing his original § 2255 motion. (*See* Civ. Dkt. 32-1 at 2 ("it is likely (though not certain) that certain issues raise[d] in the pro se petition and motions would be dropped, thereby eliminating unnecessary briefing")). This Court granted that motion on September 13, 2016. (Civ.

2

Dkt. 36). After unopposed requests for extensions of time, Sabir's counsel filed his memorandum on May 22, 2017. (Civ. Dkt. 43).

In this memorandum, the Government responds only to the issues raised in the May 22, 2017 submission, and requests that Sabir's various pro se motions, to the extent they remain outstanding, be denied as moot, having been superseded by the May 22 submission.

## FACTUAL BACKGROUND

### A.    Sabir's Offense Conduct

Rafiq Sabir conspired with his long-time friend, Tarik Shah, to support the al Qaeda terrorist organization by providing martial arts training to its terrorists and medical services to its wounded fighters, and also attempted to provide that support. The culmination of Sabir and Shah's conspiracy to provide material support to al Qaeda was a meeting with an undercover agent posing as an al Qaeda recruiter, in which Sabir swore *bayat*—an oath of allegiance—to al Qaeda and Osama bin Laden.

The Government proved its case by demonstrating through witness testimony and the presentation of physical evidence seized from the residences of Shah and Sabir that both men subscribed to a militant form of Islam for many years before trying to join al Qaeda and assist its jihad mission. The investigation also employed a confidential informant, who became close to Shah in the course of taking bass lessons, and recorded hours of conversation in which Shah discussed his and Sabir's views and plans to train potential mujahideen in deadly martial arts techniques,

3

among other things. Shah expressed to the confidential informant that he was interested in obtaining a warehouse space to conduct his martial arts training, and even visited a potential site for this purpose. To start the next phase of the investigation, the FBI introduced an undercover agent—FBI Special Agent Ali Soufan—to pose as an al Qaeda recruiter. Shah indicated to Soufan, among other things, that he and Sabir would both be very interested in meeting the recruiter, and that they came together, as a "pair." Shah also emphasized his own skills in providing martial arts training, and Sabir's skills as a medical doctor with training in emergency medicine.

After additional meetings, Soufan, Shah, and Sabir met on May 20, 2005. When Sabir expressed interest in meeting mujahideen brothers in Saudi Arabia, where he had been working as a doctor and to where he was scheduled to return shortly, Soufan probed further to make sure that Sabir understood that the agent was talking about al Qaeda. Later in the meeting, after giving Sabir numerous opportunities to back out, Soufan offered to take *bayat* from Sabir and Shah, wherein they would pledge an oath to al Qaeda and Osama bin Laden. First Shah and then Sabir took the oath, which Soufan administered in both English and Arabic. Sabir also provided his mobile phone number to Soufan—using a code—so that any al Qaeda mujahideen fighters who needed medical assistance in Saudi Arabia could contact him once he returned there.

**B.    Sabir's 2255 Motion of November 30, 2012**

Sabir's 2255 motion, filed a few days short of one year after his conviction became final, raised several different claims, all of which were styled as variants of ineffective assistance of trial and appellate counsel. He claimed that counsel (1) misadvised him; (2) improperly failed to obtain and use an Arabic translator as an expert witness; (3) failed to properly cross-examine Soufan re Sabir's knowledge of Arabic; (4) failed to challenge the authenticity of the recording of the May 20, 2005 meeting; (5) failed to call witnesses to establish that Sabir could not treat combat injuries or treat injured fighters in his apartment; (6) failed to object to certain testimony as being hearsay; (7) failed to request a mistrial regarding the admission of certain recordings and newspaper articles; and (8) failed to object to numerous instances of prosecutorial misconduct. (Civ. Dkt. 1 at 5-15). The Government responded to each of these claims in its April 13, 2013 opposition memorandum. (Crim. Dkt. 193).

**C.    Sabir's May 2017 Memorandum**

In his May 2017 Memorandum, Sabir, for the first time, claims that an affidavit from his co-defendant, Tariq Shah, demonstrates that he is actually innocent of his crimes of conviction. He also contends that this affidavit is newly-discovered evidence. The May 2017 Memorandum reiterates the claim that Sabir's counsel should have retained a linguistics expert, which was supposedly "key to the central defense theory that Sabir did not understand Arabic." (Mem. 16).

The May 2017 Memorandum raises a new ineffective assistance claim, alleging that his trial counsel was ineffective in failing to call his co-defendant, Tarik Shah, to the stand, for the purpose of challenging Shah's invocation of his Fifth Amendment privilege against self-incrimination. (Mem. 18). Finally, the May 2017 Memorandum raises a new claim of prosecutorial misconduct, alleging that the Government failed to produce exculpatory statements supposedly made by Shah during a proffer session with the Government. (Mem. 18-20).

## ARGUMENT

Sabir's only claims not barred by the applicable one-year statute of limitations are those raised in his November 2012 motion, and, as the Government explained in its previous opposition, those claims are meritless. Sabir's newly-minted claims—that an affidavit from his convicted co-defendant, Tarik Shah, somehow exculpates him, that his trial counsel provided ineffective assistance by failing to put Shah on the stand, and that the Government failed to produce exculpatory material—do not relate back to Sabir's original submission, because they have no factual connection to the claims made in that motion.

Sabir attempts to avoid the statute of limitations bar by claiming that the Shah affidavit proves Sabir's actual innocence of the charges, or that it qualifies as newly-discovered evidence and thus may be considered for that reason. Neither is true. The Shah affidavit merely provides self-serving claims from Shah regarding his crimes, and makes a bare, conclusory allegation that Sabir is not guilty. In any event, even

6

accepting the dubious proposition that the Shah affidavit is newly available, that is not the same thing as newly discovered, and so the exception does not apply.

## A.     Applicable Law

### 1.     Statute of Limitations

All claims raised in a motion attacking a federal defendant's sentence under 28 U.S.C. § 2255 are subject to a one-year statute of limitations, which runs from the latest of "(1) the date on which the judgment of conviction becomes final . . . . ; or (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2255(f). A claim raised in an otherwise untimely amended or supplemental filing does not "relate back" to the original, timely filing "when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." *Mayle v. Felix*, 545 U.S. 644, 650 (2005); Fed. R. Civ. P. 15(c). A new claim arises out of the same "conduct, transaction, or occurrence" as the original claims "only when the claims added by amendment arise from the same core facts as the timely filed claims, and not when the new claims depend upon events separate in both time and type from the originally raised episodes." *Mayle,* 545 U.S. at 645. "An amendment does not relate back merely because the proposed claims concern the same trial, or the same events presented or occurring therein, as existing claims." *Ross v. Miller,* 2016 WL 1376611, at *20 (S.D.N.Y. Apr. 7, 2016); *see Mayle*, 545 U.S. at 662 ("If claims asserted after the one-year period could be revived simply because they relate

7

to the same trial, conviction, or sentence as a timely filed claim, [the] limitation period would have slim significance."); *Gibson v. Artus*, 407 F. App'x 517, 519 (2d Cir. 2010). In particular, "[c]ourts have routinely held that ineffective assistance of counsel claims do not relate back when alleging a different ground for ineffective assistance of counsel." *Ross*, 2016 WL 1376611, at *20 (citing *Hiers v. Bradt,* 2014 WL 6804252, at *6 (E.D.N.Y. Dec. 3, 2014); *Jenkins v. Graham,* 2009 WL 1119383, at *3 (S.D.N.Y. Apr. 23, 2009)).

With respect to the operation of § 2255(f)(4), the question of when the factual predicate for a habeas claim was first discoverable is a fact-specific inquiry that requires a district court to analyze the factual bases of each claim and to determine when the facts underlying the claim were known, or could with due diligence have been discovered. *Rivas v. Fischer,* 687 F.3d 514, 535 (2d Cir. 2012). "[A] factual predicate consists only of the 'vital facts' underlying the claim. . . . [I]f new information is discovered that merely supports or strengthens a claim that could have been properly stated without the discovery, that information is not a "factual predicate" for purposes of triggering the statute of limitations under § 2244(d)(1)(D). *Id.*

### 2.    Procedural Default

Assuming that a defendant's claim satisfies the applicable statute of limitations, it nonetheless fails if it presents an issue that could have been, but was not, raised on direct appeal. Motions under § 2255 may not be used as a substitute

for a direct appeal, *see United States v. Frady*, 456 U.S. 152, 165 (1982); *United States v. Addonizio*, 442 U.S. 178, 184-85 (1979), and so a federal prisoner cannot use a § 2255 motion to litigate questions that could have been raised on direct appeal but were not. *See Rosario* v. *United States*, 164 F.3d 729, 732 (2d Cir. 1999). Such a claim may be raised in a § 2255 motion only if the defendant "can first demonstrate either cause and actual prejudice, or that he is 'actually innocent.' *Bousley* v. *United States*, 523 U.S. 614, 622 (1998) (quotations omitted); *see also Harrington* v. *United States*, 689 F.3d 124, 129 (2d Cir. 2012).

The Supreme Court has made clear that "cause" is measured by a stringent standard of diligence. *See, e.g.*, *Coleman* v. *Thompson*, 501 U.S. 722, 752 (1991) ("Cause" is "something external to the petitioner" which "cannot be fairly attributed to him"). "An example of such an objective impediment is 'a showing that the factual or legal basis for a claim was not reasonably available to counsel' at the time of trial." *Gutierrez v. Smith*, 702 F.3d 103, 111 (2d Cir. 2012) (quoting *Strickler v. Greene,* 527 U.S. 263, 283 n.24 (1999)).

"The 'prejudice' requirement is met by establishing 'actual prejudice resulting from the errors of which [Petitioner] complains.'" *Id.* at 112 (quoting *United States v. Frady,* 456 U.S. 152, 168 (1982)). This is a substantial burden. The defendant "must shoulder the burden of showing, not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial

9

disadvantage, infecting his entire trial with error of constitutional dimensions." *Frady*, 456 U.S. at 170; *Gutierrez*, 702 F.3d at 112.

If a defendant cannot demonstrate cause for and prejudice from his procedural default, he can still get his claim reviewed if he can establish "that a fundamental miscarriage of justice would result from a failure to entertain the claim." *McCleskey* v. *Zant*, 499 U.S. at 494-95. The Supreme Court has repeatedly emphasized that by the term "fundamental miscarriage of justice," it means the defendant's "actual innocence." *See Herrera* v. *Collins*, 506 U.S. 390, 404 (1993) (referring to rule requiring "proper showing of actual innocence" as the "fundamental miscarriage of justice exception" and explaining that the purpose of the exception is "to see that federal constitutional errors do not result in the incarceration of innocent persons"); *Murray* v. *Carrier*, 477 U.S. at 495-96 (explaining that the exception is reserved for those extraordinary cases "where a constitutional violation has probably resulted in the conviction of one who is actually innocent").

Furthermore, "'actual innocence' means factual innocence, not mere legal insufficiency." *Bousley*, 523 U.S. at 623 (citing *Sawyer* v. *Whitley*, 505 U.S. 333, 339 (1992)). This extremely narrow test is satisfied only if the defendant can demonstrate that his acts "have been ruled not to constitute criminal conduct." *Underwood v. United States,* 166 F.3d 84, 88 (2d Cir. 1999). A defendant "must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence. Unexplained delay in presenting new evidence bears on the

10

determination whether the [defendant] has made the requisite showing." *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1935 (2013) (quotation and citation omitted).

## B.   Discussion

### 1.   Sabir's Claims Based on Shah's Affidavit Are Time-Barred

Sabir claims that an affidavit from his co-defendant, Tarik Shah, supports his claim to vacate his sentence. However, this claim was first raised in May 2017, more than five years after Sabir's conviction became final. As a result, § 2255(f)(1) would bar this claim, unless the Shah claim somehow relates back to the timely-filed claims.

It does not. All of Sabir's original claims allege ineffective assistance of counsel in connection with various litigation decisions made by trial and appellate counsel, but none of them relate to the submission of exculpatory evidence from Shah, the decision not to force Shah to take the stand after being informed by Shah's attorney that Shah would invoke his Fifth Amendment rights against testifying, or the supposed suppression of Shah's supposedly exculpatory statements during a proffer session. As noted above, "[c]ourts have routinely held that ineffective assistance of counsel claims do not relate back when alleging a different ground for ineffective assistance of counsel." *Ross*, 2016 WL 1376611, at *20. Sabir's Shah-related claims therefore do not "relate back" to the claims in his original motion.

Although Sabir does not explicitly cite § 2255(f)(4) in his memorandum, his references to the Shah information being "newly discovered" suggest that he might be arguing that his Shah-related claims are timely because the May 2017

11

memorandum was filed within one year of "the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2255(f)(4). But Shah's affidavit does not qualify as "newly discovered" evidence regardless of how recently Sabir obtained it.

Even assuming that Sabir's counsel exercised due diligence to obtain Shah's information and resulting affidavit, Shah's affidavit would only be "newly available," not "newly discovered." *See United States v. Forbes*, 790 F.3d 403, 407 (2d Cir. 2015) (interpreting Fed. R. Crim. P. 33). Where the defendant is aware of the existence of evidence before or during trial, it will not qualify as "newly discovered" if "there was a legal basis for the unavailability of the evidence at trial, such as the assertion of a valid privilege." *Id.* at 408. Indeed, the *Forbes* Court addressed this precise situation:

> Where, as here, a defendant is aware that a coconspirator could provide exculpatory testimony, but the coconspirator refuses to do so on the basis of his Fifth Amendment privilege, that testimony—made available post-conviction by the expiration of the statute of limitations as to that co-conspirator's alleged offenses—is not newly discovered after trial and, therefore, does not constitute newly discovered evidence within the meaning of Rule 33.

*Id.* at 409.

Sabir cannot credibly claim that he was unaware that Shah, were he to testify as Sabir hoped, would have given exculpatory testimony regarding their previous conversations and interactions. Once again, the Second Circuit has considered and rejected a virtually identical claim:

> Owen claims that prior to Samuels' sentencing hearing Owen "was unaware of Mr. Samuels' ability to exculpate him." This cannot be true.

12

> Owen was clearly aware of what he did and did not speak with Samuels and Baroody [about] on the days in question. If, as Owen claims, he did not discuss with Samuels or Baroody a plan to ship marijuana to Florida, he would have known prior to trial that both Samuels and Baroody could have attested to this fact. Owen was at all times aware of Samuels' "ability" to exculpate him, but was unable to benefit from Samuels' testimony because Samuels did not make it available until after the trial was over. In these circumstances, Samuels' testimony is not newly discovered evidence within the meaning of Rule 33.

*United States v. Owen*, 500 F.3d 83, 91 (2d Cir. 2007). As Sabir acknowledges, his trial counsel sought to call Shah as a witness, advising the court that Shah's attorney had represented that, if called, Shah would assert his Fifth Amendment rights. (Mem. 10). Sabir would not have sought Shah's testimony unless he believed it would help him. Shah's affidavit is therefore not "newly discovered," and so the provisions of 28 U.S.C. § 2255(f)(4) do not apply to save that claim from the statute of limitations bar. *See id.* ("But where, as in this case, a defendant knew or should have known, that his codefendant could offer material testimony as to the defendant's role in the charged crime, the defendant cannot claim that he 'discovered' that evidence only after trial.").

## 2.   Shah's Affidavit Does Not Prove Sabir's "Actual Innocence"

Sabir contends that the Shah affidavit proves that he is actually innocent of the material support for terrorism charges for which he was convicted, and therefore is exempt from the otherwise-applicable time bar of § 2255(f). (Mem. 13-16). To the contrary, Shah's single conclusory statement—"I refused and attempted to vindicate Sabir"—falls far short of undermining Sabir's own words, recorded as they were uttered, pledging loyalty to the al Qaeda terrorist organization, and offering to make

13

himself available to tend to the injuries of those terrorists while in Saudi Arabia, where al Qaeda was actively operating, going so far as to encode his cell phone number on a piece of paper and give it to a person Sabir believed to be an al Qaeda recruiter.

Shah's affidavit claims that Shah lied repeatedly to the FBI during the investigation. In doing so, he essentially disavows his own guilty plea, in which he admitted that he conspired to provide material support to the al Qaeda terrorist organization. Such affidavits—submitted by a convicted co-conspirator, long after any credible threat of further prosecution has passed—are worthy of little if any weight. *See, e.g., Drew v. State,* 743 S.W.2d 207, 228 (Tex. Crim. App. 1987) ("It is not unusual for one of two convicted accomplices to assume the entire fault and thus exculpate his codefendant by the filing of a recanting affidavit or other statement.").

Shah's affidavit, which consists of little more than "anything I told the FBI about Sabir was a lie, and he didn't do it," squarely contradicts the substantial evidence proving Sabir's guilt, which the Second Circuit summarized when affirming Sabir's conviction on direct appeal:

> On May 20, 2005, during a visit to New York, Sabir met with Saeed and Agent Soufan at Shah's Bronx apartment. Sabir told Soufan that he would soon be returning to Riyadh. He expressed interest in meeting with *mujahideen* operating in Saudi Arabia and agreed to provide medical assistance to any who were wounded. *See* GX 906T at 15, 87. He suggested that he was ideally situated to provide such assistance because he would have a car in Riyadh and "carte blanche" to move freely about the city. *Id.* at 67.

14

To ensure that Shah and Sabir were, in fact, knowingly proffering support for terrorism, Soufan stated that the purpose of "our war, ... our *jihad* " is to "[e]xpel the infidels from the Arabian peninsula," *id.* at 22, and he repeatedly identified "Sheikh Osama" (in context a clear reference to Osama bin Laden) as the leader of that effort, *see, e.g., id.* at 31, 34, 59, 87, 98–99. Shah quickly agreed to the need for war to "[e]xpel the Jews and the Christians from the Arabian Peninsula," *id.* at 22, while Sabir observed that those fighting such a war were "striving in the way of Allah" and "most deserving" of his help, *id.* at 66.

To permit *mujahideen* needing medical assistance to contact him in Riyadh, Sabir provided Soufan with his personal and work telephone numbers. *See id.* at 40, 83. When Shah and Soufan noted that writing down this contact information might create a security risk, Sabir encoded the numbers using a code provided by Soufan. *See id.* at 49–53.

Sabir and Shah then participated in *bayat,* a ritual in which each swore an oath of allegiance to al Qaeda, promising to serve as a "soldier of Islam" and to protect "brothers on the path of *Jihad* " and "the path of al Qaeda." *Id.* at 106–08, 114–16. The men further swore obedience to "the guardians of the pledge," whom Soufan expressly identified as "Sheikh Osama," *i.e.,* Osama bin Laden, and his second in command, "Doctor Ayman Zawahiri." *Id.* at 98, 108–10, 115.

*Farhane*, 634 F.3d at 133.

No hearing is necessary to reject Sabir's claims. The overwhelming evidence of his guilt, provided principally through recordings of his own statements, demonstrates that no rational jury, if presented with Shah's testimony, would have determined that Sabir was actually innocent. Other courts have similarly rejected such codefendant affidavits in support of habeas motions. *See, e.g., Allen v. Yukins*, 366 F.3d 396, 406 (6th Cir. 2004) ("Allen's evidence of her alleged innocence consists of two postconviction affidavits from her codefendants. One affidavit is facially insufficient to establish that Allen is innocent; the other is inherently unreliable and

contradicted by the evidence presented at trial. In light of the foregoing, we conclude that a reasonable juror could easily find beyond a reasonable doubt that Allen is guilty of assault with the intent to commit murder."); *Carter v. Virginia,* 2010 WL 331758, at *6 (E.D. Va. Jan. 26, 2010) ("Given Davis's prior statements implicating Carter in the murder of Bailey and the timing of Davis's affidavit, the Court concludes that Davis's affidavit is not 'trustworthy' and does not constitute 'reliable' evidence of innocence sufficient to support a claim of actual innocence. . . To accept such commonplace declarations would ignore the Supreme Court's admonition that the quality of evidence necessary to support a claim of actual innocence 'is obviously unavailable in the vast majority of cases.'") (citing *Schlup v. Delo,* 513 U.S. 298, 324 (1995)). Sabir is not innocent of the charges for which he was convicted.

### 3.   Sabir's Arabic Proficiency Was Not A Material Issue At Trial

Sabir reiterates his claim that his trial counsel rendered constitutionally ineffective assistance of counsel by failing to retain and call a linguistics expert to testify regarding Sabir's Arabic proficiency. The Government addressed this claim in its April 13, 2013 opposition memorandum, and incorporates those arguments here.

The affidavit of Professor Schmitz establishes nothing more than what the Government maintained at Sabir's trial, namely, that Sabir had a limited knowledge of Arabic. The Government never claimed that Sabir was a fluent Arabic speaker. The transcript of the May 20, 2005 meeting demonstrates beyond any doubt that

Sabir was told *in English* exactly what the *bayat* was, and that he understood exactly to whom he was pledging his fealty.

Sabir could not possibly have been prejudiced by the absence of a linguistics expert. Sabir himself testified as to his limited Arabic, and on the recording itself told Special Agent Soufan "I speak a little Arabic." (GX 906T at 12). As explained in the April 13, 2013 opposition, the Government's closing argument walked through the May 20 conversation in great detail. (Tr. 2323-40). That explanation revealed the numerous times Special Agent Soufan explained matters to Sabir in English, ensuring his understanding of precisely what he was doing. Accepting Mr. Schmitz's affidavit at face value, it would not have changed anything about the weight of the evidence against Sabir at trial. As a result, he suffered no prejudice from its absence.

### 4.    Shah Had A Valid Fifth Amendment Privilege

Sabir claims that his trial counsel was constitutionally ineffective for failing to demand Shah's appearance at trial, because "the Fifth Amendment was facially unavailable based on his earlier plea." (Mem. 18). This is simply incorrect. Sabir's trial took place in April and May of 2007. Shah had pled guilty but had not yet been sentenced (he was sentenced on November 7, 2007). Shah retained his Fifth Amendment privilege pending sentencing. *See Mitchell v. United States*, 526 U.S. 314, 325-27 (1999) (Fifth Amendment privilege applies until sentencing).

17

### 5.      Any Exculpatory Information From Shah Was Immaterial

Sabir relies on the Shah affidavit—and nothing else—to claim that Shah supposedly exculpated him during a proffer session with the Government. Although the Government categorically denies that it failed to satisfy its disclosure obligations, this Count need not delve into that factual question, because even assuming that Sabir's claim is correct, events would still have unfolded precisely as they did in 2007.

Assuming that Shah had indeed attempted to exculpate Sabir during Shah's proffer sessions, the Government would have disclosed that information to Sabir. Of course, as noted above, because Sabir knew full well what conversations he had had and had not had with Shah, he did not need to hear third-hand through the Government what Shah was saying about their discussions. But putting that aside, even armed with such "exculpatory" information, Sabir could only have done one thing: attempt to call Shah as a defense witness. That is, of course, exactly what his trial counsel did. Sabir's attorney contacted Shah's lawyer, and received the message that there was no point in calling Shah, because he would just take the Fifth. Sabir's lawyer memorialized that in a representation to the Court. As a result, Shah was not available to be a witness at Sabir's trial, even if he had had "exculpatory" testimony to provide.

To reiterate, the Government does not agree that it failed to disclose anything. But Sabir's claim can and should be rejected without considering that question, because he cannot have suffered any prejudice from any such failure.

18

**CONCLUSION**

For the foregoing reasons, the Government respectfully submits that Sabir's motion under 28 U.S.C. § 2255 should be denied in its entirety without a hearing.

Dated:      New York, New York
            July 23, 2017


                        Respectfully submitted,

                        JOON H. KIM
                        Acting United States Attorney


            By:    /s/_____
                        Karl Metzner
                        Assistant United States Attorney
                        (212) 637-2476

19